**CLARKSON LAW FIRM, P.C.**
Glenn A. Danas (SBN 270317)
*gdanas@clarksonlawfirm.com*
Cody Laux (SBN 359748)
*claux@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Telephone: (213) 788-4050
Facsimile: (213) 788-4070

**CLARKSON LAW FIRM, P.C.**
Kristen G. Simplicio (SBN 263291)
*ksimplicio@clarksonlawfirm.com*
Laura E. Older (*Pro Hac Vice*)
*lolder@clarksonlawfirm.com*
1050 Connecticut Avenue NW, Suite 500
Washington, DC 20036
Telephone: (202) 998-2299

*Attorneys for Plaintiff and Putative Class*

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

**UNITED STATE DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

KRISTY FIELDS, individually and on behalf of all others similarly situated,

Plaintiff,

v.

COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive,

Defendants.

Case No.: 2:25-cv-03864-FLA-PVC

**FIRST AMENDED CLASS ACTION AND PAGA COMPLAINT**

1. Failure to Pay Minimum Wage and Liquidated Damages (Cal. Lab. Code §§ 1182.12, 1194, 1197, 1197.1, 1198; IWC Wage Order 4-2001);
2. Failure to Pay Overtime Wages and Liquidated Damages (Cal. Lab. Code § 510; IWC Wage Order 4-2001);
3. Failure to Provide Rest Periods or Rest Break Premium Wages (Cal. Lab. Code §§ 226.7, 558.1);
4. Failure to Provide Meal Periods or Meal Premium Wages (Cal. Lab. Code §§ 226.7, 512(a), 1198; IWC Wage Order 4-2001);
5. Failure to Timely Pay Wages During Employment (Cal. Lab. Code § 204);
6. Failure to Keep Requisite Payroll Records (Cal. Lab. Code § 1174(d));
7. Failure to Provide Timely and Accurate Wage Statements (Cal. Lab. Code § 226(a), 226(e));
8. Failure to Reimburse Business Expenses (Cal. Lab. Code §§ 450, 2802; IWC Wage Order 4-2001);
9. Unfair Competition (Bus. & Prof.

Code § 17200 *et seq.*)

10. Violations of the Private Attorney General Act (Cal. Lab. Code §§ 2698-2699.8)

**JURY TRIAL DEMANDED**

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

**TABLE OF CONTENTS**

**Page No.**


I. INTRODUCTION .......... 1

II. JURISDICTION AND VENUE .......... 4

III. THE PARTIES .......... 5

IV. FACTS COMMON TO ALL CLASS MEMBERS AND AGGRIEVED EMPLOYEES .......... 7

A. Color Street Is a Successful Multilevel Marketing Company That Is Dependent on its Stylists to Engage in Social Media Marketing on Its Behalf .......... 7

B. Color Street Stylists Are Employees .......... 10

1. Controlling Law .......... 10

2. Stylists Are Not Free from Color Street's Control .......... 13

3. Stylists' Work Is Not Outside Color Street's "Usual Course of Business" .......... 16

4. Color Street Cannot Meet Its Burden To Show That Stylists Are "Customarily Engaged" in a Separate Business .......... 16

5. Color Street Stylists Are Not "Direct Sellers." .......... 18

i. Background on MLMs and the Direct Sales Exemption .......... 18

ii. Color Street Stylists Do Not Perform the Jobs Identified in the Direct Sales Exemption. .......... 19

iii. Color Street's Modern E-Commerce Business Is Unlike Past and Present Direct Sales Companies. .......... 23

6. The Terms and Conditions in the Stylist Agreement are Unconscionable, Unfair, and Unlawful. .......... 25

C. Color Street's Misclassification of Plaintiff and Stylists Was Willful. .......... 27

D. Color Street's Misclassification of Stylists and Unfair Business Practices Harm the California Public. .......... 29

1. Color Street Uses Widespread Advertising Practices Directed at the General Public to Recruit New Stylists. .................................. 29

2. Color Street's Unfair and Unlawful Conduct Harms California In Other Ways. .................................. 31

E. Plaintiff's Experiences as a Color Street Stylist .................................. 32

V. CLASS ALLEGATIONS .................................. 35

VI. FACTS RELATING TO PLAINTIFF AS A PRIVATE ATTORNEY GENERAL .................................. 38

VII. CAUSES OF ACTION .................................. 40

FIRST CAUSE OF ACTION .................................. 40

SECOND CAUSE OF ACTION .................................. 42

THIRD CAUSE OF ACTION .................................. 43

FOURTH CAUSE OF ACTION .................................. 45

FIFTH CAUSE OF ACTION .................................. 46

SIXTH CAUSE OF ACTION .................................. 47

SEVENTH CAUSE OF ACTION .................................. 48

EIGHTH CAUSE OF ACTION .................................. 50

NINTH CAUSE OF ACTION .................................. 52

"Unlawful" Prong .................................. 52

"Unfair" Prong .................................. 53

TENTH CAUSE OF ACTION .................................. 55

VIII. PRAYER FOR RELIEF .................................. 57

IX. DEMAND FOR TRIAL BY JURY .................................. 57


Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Plaintiff KRISTY FIELDS brings this action, individually, and behalf of a class of similarly situated individuals, against COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive, (collectively, "Defendants" or "Color Street"). Plaintiff's allegations against Defendants are based upon investigation carried out by Plaintiff's counsel, except for allegations pertaining specifically to Plaintiff, which are based upon Plaintiff's personal knowledge.

## I. INTRODUCTION

1. Color Street is a massively successful company that, for years, has exploited its California salesforce by misclassifying its workers as independent contractors rather than as employees. Plaintiff is a Color Street "Stylist", one of the approximately 130,000[1] active sales workers in the United States who sell Color Street products through their online networks under Color Street's strict direction and control. In exchange for Stylists' work promoting the brand on social media, acquiring new customers, engaging existing customers, providing customer service, recruiting and training new Stylists, and driving traffic to Color Street's website, Color Street pays them, at most, a paltry commission.

2. In 2017, Fa Park, the developer of dry nail polish strips, founded a direct sales company to sell his invention: Color Street. Headquartered in Clifton, New Jersey, Color Street develops and sells a wide range of nail polish strips, skincare, and cosmetics online. Pursuant to Color Street's business model, it establishes relationships with various individuals known as "Stylists" who market and sell Color Street products. Color Street has spent a great deal of time and resources in implementing and managing a broad range of employment policies and procedures for Stylists. Despite designating these salespeople as independent contractors, these

[1] While Color Street does not directly disclose how many Stylists it has, the company actively partners with March of Dimes, which notes that Color Street currently has 130,000 Stylists. *Color Street*, MARCH OF DIMES, https://www.marchofdimes.org/color-street (last accessed Mar. 5, 2025).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Stylists are in fact employees under California law. Color Street has violated numerous provisions of the California Labor Code and applicable IWC Wage Order by denying its Stylists the compensation, other benefits and statutory entitlements that they are owed.

3. Color Street maintains a centralized, rigorous, and stringent sales policy to which each of its Stylists must rigidly adhere should they expect any commission for their sales of Color Street products. Even when these Stylists do follow Color Street's exacting direction to the tee, the majority of Stylists fail to even break even, having sunk substantial personal investment into marketing Color Street products—business expenditures which Color Street shifts onto their frequently financially insecure, female workers and which Color Street refuses to reimburse.

4. Via its pervasive marketing and sales guidelines, Color Street directed Stylists to market and sell a variety of consumer products, including nail polish strips, skincare, and cosmetics. In exchange for the Stylists' work promoting the brand on social media, referring new customers, providing customer service, and driving traffic to Color Street's website, Color Street pays Stylists at most a paltry commission.

5. Color Street's ability to avoid accountability to its employees thus far—turns on the fact that it operates as multi-level marketing business ("MLM").[2] Color Street's recruitment tactics purportedly promise its Stylists the opportunity to build a business; in reality, however, they supply free marketing and sales support for Color Street.

6. California legislature's codification of the "ABC Test" in AB 5 did include a "direct sales" exemption, which incorporated a definition appearing in a 40-year-old statute, California's Unemployment Code § 650. Among other things, the exemption is expressly limited only to those salespersons making "in person" sales, such as door-to-door salespeople and home "Tupperware party" hosts. It does not

[2] Gerald Albaum & Robert A. Peterson, *Multilevel (Network) Marketing: An Objective View*. 11 MARKETING R. 347, 347–61 (2011).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

cover Color Street's modern, online business model, where Stylists drive social media engagement under Color Street's guidance and direction, directing consumers to Color Street-controlled websites, where Color Street accepts and processes the sales and fulfills the orders, while also collecting and benefiting from the consumer data it acquires from these leads. The result is a coordinated marketing campaign that increases exposure and awareness of the Color Street products and is essential to the company's ability to reach new customers.

7. As articulated in Color Street's own Policies & Procedures, "[w]e highly encourage you to market your PW [Personal Website] link in order to drive online sales to your business."[3] These "Personal Websites" or "Replicated Websites" display the same Color Street website as normally shown, but with "Your Stylist: [Stylist's Name]" displayed in the top left corner. Stylists cannot edit the content, text, photos, prices, or any aspect of the Replicated Website, which only serves to give them credit for sales.

8. Color Street strictly controls the work product of its Stylists, in part by ensuring that they follow its rigid guidelines for marketing content and recruiting materials. In recent years, Color Street's direction and control of its Stylists work product has become all-encompassing.

9. Plaintiff was a victim of Color Street's practices. Like all Stylists, in accordance with Color Street's strict marketing and sales protocols, Plaintiff was trained by other Stylists and through Color Street materials, and was required to market, distribute, and sell Products to the public in accordance with Color Street's instructions and parameters. And in return, Plaintiff was paid virtually nothing, while incurring unreimbursed personal costs to perform the work on Color Street's behalf.

10. For these reasons, Plaintiff brings this action to recover unpaid wages, overtime compensation, penalties, interest, injunctive relief, other equitable remedies, damages, and reasonable attorneys' fees and costs under the California Labor Code,

[3] Ex. A ("Policies and Procedures"), § 4k.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Cal. Lab. Code §§ 201, 202, 203, 204, 226(a), 226.7, 226.8, 510, 512(a), 1174(d), 1194, 1197, 1197.1, 1198, 2800, 2802 and 2698 *et seq*. (the "CLC"), IWC Wage Order 4-2001 (8 Cal. Code Regs. § 11040), and California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq*.). In addition, Color Street's conduct violates various municipal and county codes in California, including but not limited to City of Los Angeles Municipal Code Art. 7; County of Los Angeles Code § 8.100.040, *et seq*., San Francisco Cal. Code 12R.

11. Upon information and belief, Color Street has not addressed and/or changed its unlawful practices including failing to provide complaint meal and rest periods and has continued to deprive employees of money owed to them in straight and overtime compensation. By bringing this action, Plaintiff intends to stop this ongoing and unlawful practice and recover back wages and overtime to which she is rightfully entitled.

## II. JURISDICTION AND VENUE

12. The monetary damages, civil penalties, restitution, and equitable relief sought by Plaintiff, the class members, and other aggrieved employees exceed the minimal jurisdiction limits of the Superior Court and will be established according to proof at trial.

13. This Court has jurisdiction over this action pursuant to the California Constitution, Article VI, section 10. The statutes under which this action is brought do not specify any other basis for jurisdiction.

14. This Court has jurisdiction over all Defendants because, upon information and belief, Defendants are citizens of California, have sufficient minimum contacts in California, or otherwise intentionally avail themselves of the California market so as to render the exercise of jurisdiction over them by California courts consistent with traditional notions of fair play and substantial justice. Indeed, Color Street has previously registered with the California Secretary of State as conducting business in California. Moreover, the acts and omissions detailed herein occurred in California.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

15. Venue is proper in this Court because Plaintiff performed work for Defendants from her home in Norwalk, California: within Los Angeles County. Defendants' acts and omissions in violation of the relevant labor statutes are thus physically tied to Plaintiff's residential address.

16. Upon information and belief, Defendants direct and control a large workforce of "Stylists" throughout California, including in Los Angeles County, and have agents, employ individuals, and/or transact business in the State of California, County of Los Angeles.

## III. THE PARTIES

17. Plaintiff Kristy Fields is an individual and resident of Norwalk, California.

18. Color Street LLC and Incoco Products LLC are entities incorporated under the laws of the State of New Jersey, with a shared principal place of business in Totowa, New Jersey. Color Street LLC and Incoco Products LLC hold themselves out to the public as a single entity, known as Color Street.

19. Incoco Capital LLC is an entity incorporated under the laws of the State of Delaware with a principal place of business in New York. Plaintiff is informed and believes and based thereon alleges that Incoco Capital LLC is the parent company of Color Street LLC and Incoco Products LLC.

20. Plaintiff is informed and believes and based thereon alleges that Fa Park is, and at all times relevant hereto was, an individual residing in Palm Beach Gardens, Florida, as well as Founder and Chief Executive Officer of Color Street LLC, Incoco Products LLC, and Incoco Capital LLC. Plaintiff is further informed and believes and based thereon alleges that Fa Park, in his capacity as the Founder and Chief Executive Officer of Color Street LLC, Incoco Products LLC, and Incoco Capital LLC, exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated,

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

the above-referenced and below-referenced California Labor Code provisions in violation of §§ 558.1, 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

21. Plaintiff is informed and believes and based thereon alleges that Brian J. Lee is, and at all times relevant hereto was, an individual residing in New Jersey, as well as Senior Vice President of Finance of Color Street LLC and executive of Incoco Capital LLC. Plaintiff is further informed and believes and based thereon alleges that Brian J. Lee, in his capacity as the Senior Vice President of Finance of Color Street LLC and executive of Incoco Capital LLC, exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced California Labor Code provisions in violation of §§ 558.1, 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

22. Plaintiff is informed and believes and based thereon alleges that Brick Bergeson is, and at all times relevant hereto was, an individual residing in Rutherford, New Jersey, as well as Chief Revenue Officer of Color Street. Plaintiff is further informed and believes and based thereon alleges that Brick Bergeson, in his capacity as the Chief Revenue Officer of Color Street, exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced California Labor Code provisions in violation of §§ 558.1, 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

23. Plaintiff is informed and believes and based thereon alleges that Matt Warner is, and at all times relevant hereto was, an individual residing in New Jersey, as well as Chief Operations Officer of Color Street. Plaintiff is further informed and believes and based thereon alleges that Matt Warner, in his capacity as the Chief

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Operations Officer of Color Street, exercised control over the wages, hours and/or working conditions of Plaintiff and other aggrieved employees, including by informing employees when to report to work and what work hours should actually be recorded, violated, or caused to be violated, the above-referenced and below-referenced California Labor Code provisions in violation of §§ 558.1, 1197.1 and the Industrial Welfare Commission ("IWC") Wage Orders.

24. The true names and capacities of Defendants sued as DOES 1–50, inclusive, are unknown to Plaintiff, who therefore sues said Defendants by such fictitious names pursuant to California Code of Civil Procedure § 474. Plaintiff will seek leave to amend this Demand when said true names and capacities have been ascertained.

## IV. FACTS COMMON TO ALL CLASS MEMBERS AND AGGRIEVED EMPLOYEES

### A. Color Street Is a Successful Multilevel Marketing Company That Is Dependent on its Stylists to Engage in Social Media Marketing on Its Behalf

25. Color Street is a massively successful multi-level (network) marketing company that serves both US and international markets with its portfolio of nail polish strips, hand and nail care products, and makeup.[4] Fa Park founded Color Street in 2017 as the direct selling company for the dry nail polish strips he had first developed in 1988.[5] Before starting the MLM, Fa Park had sold his dry nail polish strips in traditional retail outlets under different brand names, including Incoco. Since launching, the New Jersey-based Color Street has expanded its business internationally to Canada and Europe.[6]

/ / /

[4] *About Color Street,* COLOR STREET, https://www.colorstreet.com/home/aboutus (last visited Mar. 5, 2025).
[5] *Id.*
[6] *Frequently Asked Questions,* COLOR STREET, https://www.colorstreet.com/home/faq (last visited Mar. 6, 2025).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

26. Color Street's success stems from its dependence on a massive network of Stylists. The organization's multi-level marketing, or "network marketing" or "direct sales," structure is the sole reason for Color Street's continued profitability.

27. But Color Street has for years exploited its California salesforce of Stylists by misclassifying these so-called Stylists as independent contractors rather than as employees. In knowingly and willfully misclassifying these employees, Color Street has been able to mine free marketing and sales support from their Stylists. The cost of sales and marketing that Color Street has thus far offloaded on its Stylists is highly valuable, potentially worth millions.

28. This is particularly egregious as Color Street's workforce is primarily comprised of marginalized and financially insecure individuals. Color Street targets and recruits women who are often shut out of traditional workplaces, such as those with criminal records, women who were raised in or who are active in certain religious communities, women with childcare responsibilities, and military wives.[7] Due to their alienation from traditional workplaces, those targeted by Color Street tend to be less familiar with their labor protections and with employment law generally. Unfortunately, these women, already stretched thin energetically and financially, are less well-positioned to understand their rights as workers, less likely to identify when their protections are violated, and less able to seek recourse when such violations occur.

29. Over the last decade, Color Street sales have moved from in-person to primarily online. This means that the lion share of Color Street product sales would not be exempt under the AB 5 "direct sales" exemption, California's Unemployment

---

[7] "The vast majority of people who join multi-level marketing companies do not earn a profit. Those people [] also tend to be women who seek additional income to support a family or to find community." Annie Blackman, *Regulating The Reluctant: Policies That Benefit Vulnerable Participants In Multi-Level Marketing*, 25 U. PA. J.L. & SOC. CHANGE 83, 83 (2021); *see generally* Krista Marie Federico, Dissertation, *She Works Hard for No Money: Understanding Women's Participation in Multi-Level Marketing Organizations,* U. ARIZ. SCH. SOCIO. (2020).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Code § 650. A confluence of factors precipitated the shift of sales to the virtual realm. First and foremost, social media sites such as Facebook, X (Twitter), Instagram, and TikTok have evolved into powerful marketing tools, and the adoption of these social media are now ubiquitous in the direct sales of Color Street products. Social media platforms are now the predominant way MLM sellers connect with both their potential clients and their community of sellers.[8] In as early as 2019, nearly half of all Americans indicated being "inundated" by social media connections who flooded their "feeds" with posts attempting to sell MLM-affiliated products.[9] Where once direct sales required Stylists to walk door-to-door or host "Tupperware parties," now all Stylists have to do is "post their products on social media to capture the attention of hundreds or thousands of people at once."[10]

30. Secondly, COVID and associated lockdowns halted the ability of Stylists to perform in-person sales, while also accelerating the widespread adoption of video chatting software like Zoom among their potential customer bases. This led Stylists who had not yet already adapted to fully-remote sales to do so in order to adhere to lockdown policy. And since the initial draw for many Stylists was Color Street's promise of flexible, autonomous work, it can be inferred that the flexibility that comes with online sales means that there will be no future significant, de-transition to in-person sales by Stylists.

31. While some MLMs rely on home parties, door-to-door sales calls, and other forms of in person selling, Color Street's model is designed so that Stylists can work online to solicit leads and recruit new Stylists. Color Street entices new Stylists to join by emphasizing the ease of online work: "All products are warehoused and

---

[8] Lindsay R. Maher, *Note: Americon Dream: Social Pressures and Lackluster Regulation Allow Multi-Level Marketing Companies to Function as De Facto Pyramid Schemes*, 108 MINN. L. REV. 1587, 1622 (2024).

[9] Erika Giovanetti, *MLM Consultants Pressure Friends and Family to Overspend, and It's Straining Relationships*, LENDINGTREE (Dec. 16, 2019), https://www.lendingtree.com/debt-consolidation/survey-mlm-consultants-pressure-spending/.

[10] *Id.*

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

shipped by Color Street. When you enroll as a Stylist, you will receive a Color Street replicated website designed to be your online shop. You personally present our products, customers purchase products from your replicated website, and Color Street then processes the order and ships on your behalf and pays you a commission."[11]

32. Despite the pivotal role of its salesforce, Color Street has never properly classified Stylists as employees. Rather, Color Street adheres to a multi-level (network) marketing organization structure, in which it offers people the purported "opportunity" to develop their own business earning commission by selling Color Street products and recruiting others to do the same, designating them as "independent contractors."

33. However, these Stylists are not independent contractors under applicable law. Color Street instead chose to unlawfully secure an expansive marketing and sales network for minimal to no cost. It has reaped enormous profits by deliberately avoiding paying wages and benefits to those performing the sales work that forms the backbone of Color Street's business. Color Street charges its Stylists for access to the instrumentalities needed to sell products, further increasing its profits and decreasing Stylists' pay, in violation of California law. The intended result is for Stylists to receive, at most, de minimis profit from their work, while providing free labor and shouldering the costs of doing business that Color Street should be bearing.

## B. <u>Color Street Stylists Are Employees</u>

### 1. Controlling Law

34. Companies like Color Street were never supposed to be allowed to run an entire business on the backs of independent contractors. People who work in a company's core line of business are its "employees." *United States v. Silk*, 331 U.S. 704, 718 (1947).

/ / /

---

[11] *Frequently Asked Questions*, COLOR STREET, https://www.colorstreet.com/home/faq (last visited Mar. 6, 2025).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

35. Color Street claims an unprecedented portion of its workforce as "independent contractors." In its most recently published numbers, Color Street disclosed that it had 130,000 Stylists in the United States[12] and had an estimated 501-1,000 employees.[13] Thus, Color Street claims at least 99.2% of its workforce as "independent contractors." The proportion of workers that Color Street considers "employees" has likely remained level at 0.8%—this will be confirmed should this matter proceed to discovery.

36. Color Street employees perform a variety of roles: some work as human resources specialists, graphic designers, and others in research and development or production of the company's products. These workers receive special treatment from Color Street, including paid time off, retirement plans with company match, as well as medical, dental, vision, disability, and life insurances.[14]

37. But Stylists, who make up the bulk of Color Street's workforce, are denied even the most basic protections of federal and state labor laws. Color Street does not pay them minimum wage; it does not pay overtime; and it does not reimburse business expenses, such as internet connections, laptops, smart phones, or post promotion over Facebook, YouTube, and Instagram. Its classification of its Stylists also deprives them of basic protections against discrimination and sexual harassment.

38. By design, "independent contractors" are exempted from "nearly every" labor law, but this classification was not meant to be a loophole for companies like Color Street, whose Stylists are effectively modern day telemarketers.[15] "Historically,

---

[12] *Color Street*, MARCH OF DIMES, https://www.marchofdimes.org/color-street (last accessed Mar. 5, 2025).

[13] *Color Street HQ: Innovative Cosmetic Concepts - About*, LINKEDIN, https://www.linkedin.com/company/innovative-cosmetic-concepts/about/ (last visited Mar. 6, 2025).

[14] *Accountant: Color Street HQ and Innovative Cosmetic Concepts*, CAREER.COM, https://www.career.com/job/color-street-hq-and-innovative-cosmetic-concepts/accountant/j202307141715568767235 (last visited Mar. 6, 2025).

[15] Keith Cunningham-Parmeter, *From Amazon to Uber: Defining Employment in the Modern Economy*, 96 B.U. L. REV. 1673, 1683–84 (2016).

firms reserved the independent contractor designation for entrepreneurial individuals whose skills demanded higher pay in the open market."[16] With this in mind, "[l]egislatures rationalized excluding [independent contractors] from most employment laws because these individuals did not require the same legal protections as potentially more vulnerable, less-skilled 'employees.'"[17]

39. Today, Color Street preys upon many of the most vulnerable members of our society. Despite being a $40 billion industry, "the vast majority of people involved in them don't make money off of MLMs, and many people lose money."[18] Color Street's Stylists are no exception: Color Street's own figures estimates that 63.17% of Stylists *lost* a median of $6 per month in 2023.[19]

40. MLMs like Color Street have grown during the COVID-19 pandemic, recruiting salespeople by promising remote work for the unemployed.[20] In 2021, the Federal Trade Commission issued a warning to both Color Street and Incoco regarding its deceptive and unfair conduct around promoting its money-making opportunity to those financially impacted by the pandemic.[21] These are the precise individuals that legislatures meant to shield with minimum wage and other workplace protections.

---

[16] *Id.*
[17] *Id.*
[18] Emily Stewart, *$5 Jewelry And An MLM Conference Gone Wrong: Multilevel Marketing Companies Were the "Perfect" Pandemic Business*, VOX (Sept. 23, 2021), https://www.vox.com/the-goods/22688317/mlm-covid-19-pandemic-recruiting-sales-paparazzi (citing study finding that 99 percent of MLM participants lose money).
[19] *Income Disclosure Statement: January 1, 2023-December 31, 2023*, COLOR STREET, https://www.colorstreet.com/incomedisclosure (last visited Mar. 6, 2025).
[20] Abby Vesoulis & Eliana Dockterman, *Pandemic Schemes: How Multilevel Marketing Distributors Are Using the Internet—and the Coronavirus—to Grow Their Businesses*, TIME, Jul. 9, 2020, https://time.com/5864712/multilevel-marketing-schemes-coronavirus/.
[21] *List of October 2021 Recipients of the FTC's Notices of Penalty Offenses Concerning Money-Making Opportunities and Concerning Deceptive or Unfair Conduct around Endorsements and Testimonials*, FED. TRADE COMM'N (Oct. 25, 2021), https://www.ftc.gov/system/files/attachments/penalty-offenses-concerning-money-making-opportunities/list-recipients-mmo_notice_0.pdf.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

41. In recent years, state legislatures have taken action to send a clear message that most workers should be "employees."

42. California has adopted the "ABC Test" to determine whether a company, like Color Street, has misclassified its workers as "independent contractors." Because employee status was meant to be the default, the ABC Test "presumptively considers all workers to be employees and permits workers to be classified as independent contractors only if the hiring business demonstrates that the worker in question satisfies *each* of three conditions:

A. that the worker is free from the control and direction of the hirer in connection with the performance of the work… ***and***

B. that the worker performs work that is outside the usual course of the hiring entity's business; ***and***

C. that the worker is customarily engaged in an independently established … business of the same nature as that involved in the work performed."

*Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903, 956–57 (2018) (emphasis in original).

**2. Stylists Are Not Free from Color Street's Control**

43. To engage in online marketing work for Color Street, the company does not require Stylists to hold any special experience, skills, license, or education level. Rather, Color Street requires only that a prospective Stylist use Color Street's website to purchase a "Starter Kit."[22]

44. All Stylists are then required to adhere to Color Street's many policies, codified in a document entitled the "Color Street Independent Stylist Agreement" (the "Agreement"), which incorporates by reference the "Color Street Policies and Procedures for Independent Stylists" ("Policies & Procedures"). An example of the

[22] Ex. A, § 1a.

Policies & Procedures, which Color Street periodically updates, is attached hereto as **Exhibit A** and provides that Stylists are to be considered independent contractors.[23]

45. The Policies & Procedures alone are 37 pages long and set out most of the requirements of the Stylists, including compliance with the "Color Street Culture and Values" statement, requiring Stylists to promise to market Color Street and engage in customer service in accordance with Color Street directives.[24] The two documents contain the various instructions and policies that Color Street often communicates verbally and through more informal materials, but nevertheless requires Stylists to follow when marketing Color Street and engaging in customer service on behalf of Color Street.

46. Because Color Street treats the Stylists as independent contractors, it does not pay them any salary, wages, or benefits. Rather, as is typical in the MLM industry, the Color Street Compensation Plan provides for two types of compensation: (1) for sales the Stylist made to consumers, the Stylist receives a small percentage as a commission, and (2) if the Stylist builds a "downline," i.e., recruits other new Stylists to market and sell Color Street products and recruit more Stylists, then the "upline" Stylist receives commissions for sales made by those Stylists in their downline.[25] Color Street also offers special "bonuses" to those Stylists who hit certain sales and recruiting metrics in various time frames.

---

[23] Ex. A, § 1b.

[24] Ex. A at 3.

[25] The "upline" and downline" concepts are the hallmark of the MLM structure. To illustrate, when an established Stylist, whom we will call "Amy," recruits a friend, whom we will call "Bill," to be a Stylist, Bill is in Amy's downline; and Amy is in Bill's upline. If Bill in turn recruits a new Stylist, whom we will call "Chris," then Bill has an upline (to Amy) and a downline (to Chris); the established Stylist Amy now has two levels to her downline, to Bill (first level), and Chris (second level). Should Chris then recruit someone, the established Stylist Amy would have three levels to her downline. As of March 1, 2025, Color Street began only compensating Stylists for one level of their downline. *Color Street Debuts New Comp Plan and Omnichannel Strategy*, DIRECT SELLING NEWS (Jan. 31, 2025), https://www.directsellingnews.com/2025/01/31/color-street-announces-shift-to-omnichannel-strategy/.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

47. Stylists are responsible for all expenses. This includes the cost of the mandatory Starter Kit and an auto-renewing monthly fee of $9.95 that Color Street charges all Stylists. In addition, Stylists do not receive products for free or even at a discount, but must purchase them at customer price from Color Street to create promotional posts and testimonials on social media or to distribute samples. Color Street does not reimburse Stylists for these purchases, nor for the costs of a cell phone, internet, and other routine business expenses.

48. In the Agreement and Policies & Procedures, Color Street gives itself broad rights to control Stylists and mandate conformance with its directives.

49. Color Street's reliance on an e-commerce platform limits Stylists' discretion and promotes online sales over in-person interactions. Stylists' Color Street-issued websites, "Replicated Websites," are designed in a way that ensures that Stylists operate in compliance with Color Street's marketing directives as laid out in its Policies & Procedures. Because the Replicated Website is not a standalone website, but a portal by which the public can view the products on Color Street's own website in a way that gives credit to the Stylist for the sale, the product pages and descriptions are generated entirely and solely by Color Street, with no option for the Stylist to revise or supplement either the language or photos of the products. Thus, the Stylist is in effect selling products using only Color Street-approved marketing language and intellectual property, as required by the Agreement.

50. Color Street sets the prices online and does not permit adjustments, nor is there a way for a Stylist to allow a customer to get a discount, receive a free gift, make a donation, or use any other offer that is not available on Color Street's main platforms and to all Color Street customers. This significantly limits Stylists' marketing discretion.

51. Color Street also restricts Stylists from using any platform other than Color Street's website to make online sales; in other words, they cannot sell the products directly to consumers on Facebook Marketplace, eBay, Amazon, or similar

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

sites. By making the Replicated Websites available and performing the back-end work, Stylists would be less likely to seek out other e-commerce platforms to sell the products even if they were permitted.

**3. Stylists' Work Is Not Outside Color Street's "Usual Course of Business"**

52. Color Street views the work of the Stylists to market the products online as central to its business model. As founder Fa Park says in a video featured on Color Street's website, "My vision was, how can I deliver this product to the world? … Without Stylists, it is almost impossible. I feel like we are one unit."[26] The primary benefit to Color Street from the Stylists' work is the way in which they drive people to Color Street's website and fuel engagement with the brand. Color Street gets increased visibility on social media, enabling it to compete in a saturated beauty and personal care market more cheaply. For much the same reason that brands turn to influencers, Color Street understands that social media posts from friends may be more persuasive in driving interest and generating paying customers than a paid advertisement.

**4. Color Street Cannot Meet Its Burden To Show That Stylists Are "Customarily Engaged" in a Separate Business**

53. Color Street cannot meet its burden to show that Stylists are "customarily engaged" in an independently established sales and marketing business. Instead, most Stylists are recruited regardless of their skill or experience, only perform sales and marketing for Color Street (using Color Street's approved platforms), and maintain no separate sales or marketing business.

54. Stylists are not required to have any background in sales, marketing, or beauty and nail care prior to becoming a Stylist. Stylists are not required to have any licensure or meet any educational requirements, either. For example, they do not need

[26] *About Color Street,* COLOR STREET, https://www.colorstreet.com/home/aboutus (last visited Mar. 5, 2025).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

to be licensed nail technicians or cosmetologists, nor have any schooling, training, or prior employment in fields relating to beauty or nail care. Nor does Color Street require that they have schooling, training, or prior employment in marketing, sales, or general business. Instead, Color Street only requires that a prospective Stylist complete a short application asking for basic personal information and agree to pay the monthly fee. In fact, most Stylists have little to no prior relevant experience or training.

55. Most Stylists have never owned or operated their own separate sales business outside of Color Street. And most Stylists do not maintain any registered or incorporated sales or marketing business, for their work with Color Street or otherwise. Stylists generally do not hold themselves out to others as sales or marketing professionals or maintain any office or business address.

56. Rather than rely on Stylists' own business acumen or sales experience to market products, Color Street provides the instrumentalities of Stylists' sales and marketing work. These include the "Virtual Office" (a password-protected website which includes a tool for Stylists to send emails to customers and their downline Stylists, as well as a gallery of approved images and video clips), the Replicated Website (the content of which is provided by Color Street and does not allow deviation from the standard template), the Color Street Stylist app, and Color Street scripts and graphics for use in marketing.

57. Ultimately, Color Street intends for Stylists to see Color Street as an employer, not as client. In other words, regardless of whether a Stylist maintains any kind of independent business, Color Street's policies and mandated instrumentalities of work make it so the Stylist responsibilities are not those that are of the sort that would be performed by an independent and trained professional. For example, Color Street requires Stylists to identify themselves by their names and as "Color Street Independent Stylists" on social media profiles and posts.[27] The expectation is that the

[27] Ex. A, § 4a.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Stylists are using Color Street's brand to sell, not their own business's identity. Likewise, Color Street's policies promoting sales through the Replicated Websites, restrictions on using other websites as a point of sale, and limitations on where the products can physically be sold effectively prevent Stylists from integrating the sale of Color Street products into any pre-existing business. And Color Street prohibits Stylists from using its platforms to promote other businesses, including any other multi-level marketing companies.

58. Similarly, those experienced in social media marketing are not allowed to use the kinds of tools relied upon by professionals in the field. People with digital marketing experience cannot leverage their skills because Color Street does not provide access to data collected from visitors to Stylists' Replicated Website, nor the ability to track them and target ads to them. Instead, Color Street designs the overall social media advertising campaign, and supplies the Stylists with hashtags, scripts, promotional photos and video clips, and other strategic advertising directives for the Stylists to use to sell Color Street's products on social media.

59. Further, Color Street actively limits Stylists' ability to engage in sales or marketing opportunities outside Color Street. For example, Color Street prohibits Stylists from recruiting other Stylists to join other MLMs or even to market other MLM products to fellow Stylists.

**5. Color Street Stylists Are Not "Direct Sellers."**

60. Despite classifying the Stylists as Independent Contractors, they are employees under California law. As set forth below, while some MLM workers might meet the narrow statutory exemption for those employed in "direct sales," Stylists do not.

*i. <u>Background on MLMs and the Direct Sales Exemption.</u>*

61. For many years, the MLM industry has enjoyed notoriety for its ability to carve out loopholes from federal and state employment laws, permitting MLMs to treat its sales personnel as independent contractors. These regulations were enacted

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

in the 1970s and 1980s, and in California, the exemption describes a different job than what Stylists perform.

62. When AB 5 was passed in 2019, it codified the opinion in *Dynamex Operations West, Inc. v. Superior Court of Los Angeles County*, 4 Cal. 5th 903 (2018), in which it set forth a new test for misclassification (the "Dynamex Test"). When the bill was being debated, many in the MLM industry recognized that the Dynamex Test would require them to classify their workers as employees. The Direct Selling Association ("DSA"), the industry lobbying group, pushed for an exemption. As a result of those efforts, AB 5 exempts from the Dynamex Test any salesperson "described in Section 650 of the Unemployment Insurance Code, so long as the conditions for exclusion from employment under that section are met." ("Direct Sales Exemption") For such workers who fall within the exemption, the old common law test (rather than the ABC Test) would govern the question of employee status.

63. For an entity to be covered under the Direct Sales Exemption, the hiring entity must show that the work satisfies all three criteria set forth in the statute, namely that (a) the worker performs one of two specific types of work; (b) the worker's compensation is directly tied to sales or output, and not hours worked; and (c) the worker and business have an agreement that the worker will be treated as a contractor for tax purposes. If all three criteria are not met, then the exemption does not apply, and if the worker otherwise meets the Dynamex Test, they are misclassified. While the third of these criteria—services performed pursuant to a contract identifying the person as an independent contractor—is only facially met, and even if it were an enforceable contract, that factor is not dispositive. As discussed below, the Stylist job does not satisfy the other criteria.

*ii. Color Street Stylists Do Not Perform the Jobs Identified in the Direct Sales Exemption.*

64. First, for the Direct Sales Exemption to apply, the salesperson must be performing one of two narrowly defined jobs. Specifically, the Exemption requires

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

that one be "engaged in the trade or business of primarily inperson [sic] demonstration and sales presentation of consumer products, including services or other intangibles, in the home or sales to any buyer on a buy-sell basis, a deposit-commission basis, or any similar basis, for resale by the buyer or any other person in the home or otherwise than from a retail or wholesale establishment." In other words, section (a) of the Direct Sales Exemption is best understood as identifying two specific categories of direct sales jobs, ***Primarily In Person Consumer Sales Work***, and ***Wholesale/Resale Work***, that could trigger the applicability of the Direct Sales Exemptions. The Stylist does not fall under either of these categories.

65. ***Color Street Stylists Are Not Engaged Primarily in In-Person Consumer Sales Work***. This job category covers those who are "engaged in the trade or business of primarily inperson [sic] demonstration and sales presentation of consumer products, including services or other intangibles, in the home." Thus, the exemption is limited to those who are *primarily* selling consumer products *in person* and *in the home*. These terms are significant, as they do not appear in the analogous job category of "direct sellers" under a later federal statute. *See* 26 U.S.C. § 3508(b)(2)(ii). Thus, the California exemption applies narrowly to jobs like door-to-door salespersons, or the direct sellers who work almost exclusively through the home party circuit, i.e., people who sell consumer products by meeting with other consumers in their homes.

66. As discussed throughout, Stylists do not "primarily" sell "in person." Moreover, to the extent any Stylist in the Color Street network was primarily conducting "in person" sales after the purported Color Street "digitization" the COVID pandemic would have pushed more sales online.

67. ***Color Street Stylists are not engaged in Wholesale/Resale Work.*** This job category, which also has a federal parallel, 26 U.S.C. § 3508(b)(2)(i), covers those are engaged in:

a) "sales to any buyer"

b) "on a buy-sell basis, a deposit-commission basis, or any similar basis,"

c) "for resale by the buyer or any other person", and

d) "in the home or otherwise than from a retail or wholesale establishment."

While California law does not define the terms buy-sell or deposit-commission in [b], federal law does. The term "buy-sell basis" is one in which one buys the product to sell the product, and gets paid for selling the product with the spread between the purchase price and the resale price, and term "deposit-commission basis" applies where the buyer keeps as commission for a sale of a product the deposit received from the buyer. *See* 26 U.S.C. 6041A(b)(2)(A) & (B).

68. The "Wholesale/Resale Work" is even more narrow than "In Person Home Sales Work," and does not apply to Color Street. Rather, Color Street's Agreement requires that Stylists sell only to themselves or to retail customers. Nowhere in the Agreement or in Color Street's public materials does it state that compensation is on a buy-sell or deposit-commission basis.

69. To illustrate what is meant by "Wholesale/Resale Work," a hypothetical upline Stylist Sue would be performing this work if [a] Sue was selling Color Street products to her downline Stylist Bob [c] for Bob to resell, not to keep for his own use; and [b] Sue was compensating Bob for his resale services by permitting Bob to keep the difference between the price he paid to Sue and the product's selling price or by permitting Bob to keep the deposit he acquired. Stylists do not work in this way, selling products to Stylists for Stylists to re-sell. If Bob directs a lead to his Replicated Website, and the lead purchases a product from Color Street, both he and his upline Stylist (e.g., Sue) would receive a commission for sales from Color Street. But as to Sue, [a] is not met because Sue did not sell the products to Bob. Because Bob acquired the products from Color Street to sell at retail, not to someone to re-sell, [a] and [c] are not met. As to both, [b] is not met, because neither sold the product on those terms.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Rather, Color Street takes the full payment at the point of sale and sends the product directly to the consumer, and then separately pays the Stylist.

70. ***The job descriptions in the Direct Sales Exemption predate significant changes to how MLMs now operate.*** By way of background, these two categories of jobs outlined in the Direct Sales Exemption were how MLMs organized at the time the Direct Sales Exemption was enacted. In the 1970s and 1980s, downline sellers hosted parties, traveled door to door, had booths at local fairs, or visited friends and family in their homes to hand out samples, catalogs, and sales sheets. They took orders and payment directly from the customer. Once the seller had enough orders, the seller placed the order with the company, received the shipment from the company, and then met with the customer again in person to deliver the product and if necessary, collect any further payment that might be due. The direct seller engaged with consumers both directly and personally; the consumers had little to no interaction with the company.

71. In some instances, instead of placing the order with the company, the seller performing "In Person Home Sales" would place the order with the person in their "upline," who was engaged in "Wholesale/Resale Work." The upline seller acquired products from the company, and sold them to the downline "In Person Home Sales" worker on a buy-sell or commission deposit basis for them to sell to end consumers (or to their downlines). The seller was able to do "Wholesale/Resale Work" because at the time, MLMs permitted direct sellers to fulfill their sales quotas by either selling the product to retail consumers or selling it to downline sellers.

72. Since the Direct Sales Exemption was enacted, various changes in the MLM industry occurred to move away from this model. Most notably is the fact that over the last few decades, MLMs have been forced to make changes to their operations in response to regulatory actions and civil lawsuits by private litigants to enforce anti-pyramid scheme laws. Courts and regulators have made clear that to avoid violating criminal and civil pyramid scheme laws, MLMs needed to conduct

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

operations so as to ensure that real, meaningful sales were happening directly to consumers—instead of primarily to sellers' own downlines. *See, e.g.*, *Webster v. Omnitrition Int'l*, 79 F.3d 776, 782 (9th Cir. 1996). It was not enough to simply have a policy that sales should be at retail; the law has evolved so as to require MLMs to enforce that policy and to demonstrate its effectiveness at ensuring participants were not merely stockpiling inventory and seeking to recoup losses by recruiting new sellers to buy the product from them.

73. These legal developments have prompted two important changes. First, because MLMs must ensure retail sales are occurring, few if any MLMs permit sellers to perform "Wholesale/Resale Work." Certainly, Color Street does not. Second, the work undertaken by MLMs to enforce policies as to sales at retail results in them exercising far more control than they might have decades ago.

74. Furthermore, by implementing platforms such as the Replicated Website, Color Street can better oversee Stylists in their work to ensure they are not engaging in activities that could run afoul of anti-pyramid scheme laws. Color Street can oversee all retail sales, given the vast majority occur on its website and on public social media pages. While this control may protect Stylists from being a victim of one kind of legal violation, they also remove much of the discretion that other independent MLM contractors had.

*iii.* ***Color Street's Modern E-Commerce Business Is Unlike Past and Present Direct Sales Companies.***

75. The Direct Sales Exemption and its inclusion in AB 5 was based on the MLM industry's claim that it is needed to ensure the industry can continue to offer people the opportunity to create and run their own businesses. Some MLM businesses do run operations that are predominately based on around in-person sales, promoting home parties and sales at community events, like Parent Teacher Association meetings or similar. Some do not allow consumers to buy products via a company website or they use pricing and purchasing policies that give the seller more control.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

In the primarily face-to-face, in-person sales context, the direct line between a person's effort and a closed sale may still be one that can be drawn and may allow for the kind of independent business operations contemplated by the statute.

76. Color Street's operations, however, are a stark departure. The way in which it operates its platforms, including the Replicated Websites, eliminates for the Stylist nearly all the work associated with operating a business, as compared to MLMs of the past, and of some in the present. At the same time, by removing many of the functions performed by sellers in the past, Stylists with expertise, skills, or a willingness to invest in certain areas are unlikely to realize a material change in their earnings prospects.

77. For example, the use of Replicated Websites means that skills or investment in inventory management or distribution processes are not necessary, nor will they have a material impact on a Stylist's outcome. When customers place orders on the Replicated Websites, Color Street fulfills them. Unlike some MLMs, both current and historic, as well as in the traditional wholesale context, Stylists do not need to plan to have products on hand or collect bulk orders.

78. Similarly, expertise or support in accounting, finance, economics or pricing will not impact a Stylist's outcome, because Stylists are not able to alter prices at which the products are sold on their Replicated Websites and must sell them at the rate that Color Street has determined will cover Color Street's expenses, regardless of whether the Stylist's compensation is enough to cover the Stylist's expenses. Color Street calculates, collects, and remits sales taxes, and Stylists do not need nor would benefit from experience in that area. Unlike some MLMs, both current and historic, as well as in the traditional wholesale context, Color Street does not give a larger discount or increase the percentage basis for a commission if a Stylist orders a larger amount of products for their customers.

79. Color Street also pays the Stylist's upline and downline and determines any compensation owed to them, and thus, a Stylist does not negotiate or set anyone

else's rates of pay. Color Street handles the payment interface, and thus Stylists do not need expertise in electronic payments, data security and privacy, credit card processing regulations, or similar.

### 6. The Terms and Conditions in the Stylist Agreement are Unconscionable, Unfair, and Unlawful.

80. The Agreement between Color Street and Stylists is a tool by Color Street to exert control while maximizing Color Street's profits. The Agreement is a take-it-or-leave it deal, with no opportunity for negotiation. And many Stylists discover that the arrangement is one in which they will spend extraordinary amounts of time and money promoting the company with little payoff. [28] Indeed, the effect of the Agreement, when considered in tandem with Color Street's other business practices, grossly restricts Stylists' ability to profit from their work advertising sales, and may cause Stylists to turn attention to recruiting more Stylists into a futile business endeavor.

81. Indeed, MLMs like Color Street have been criticized for the fact that few of the sellers manage to profit. At least one study concluded that 99% of MLM participants do not earn money;[29] another found that only 25% earned a profit.[30] Color Street's numbers are consistent with this low rate of success; Stylists rarely make any money. Color Street's 2023 Income Disclosure Statement presents information on Stylists who were affiliated with the company that year, and of those, 63.17% of Stylists were in the lowest "rank."[31] The average amount in commission earned by

---

[28] Abby Vesoulis & Eliana Dockterman, *Pandemic Schemes: How Multilevel Marketing Distributors Are Using the Internet—and the Coronavirus—to Grow Their Businesses*, TIME, Jul. 9, 2020, https://time.com/5864712/multilevel-marketing-schemes-coronavirus/.

[29] *Id.*

[30] *What is Multilevel Marketing (MLM)?*, AARP FOUNDATION, https://www.aarp.org/aarp-foundation/our-work/income/multilevel-marketing/ (last accessed Oct. 30, 2024).

[31] *Income Disclosure Statement: January 1, 2023-December 31, 2023*, COLOR STREET, https://www.colorstreet.com/incomedisclosure (last visited Mar. 6, 2025).

Stylists in that rank for the whole year was *negative* $8.[32] The monthly median income of Stylists in that rank was negative $6[33]—meaning that over 30% of Stylists in any given month were *paying* Color Street *more* than $6 per month to work as a Stylist. Critically, none of these figures include Stylists' full expenses. As described throughout, Stylists themselves foot the bill for event registration fees, Color Street-related travel, office supplies, insurance premiums, products purchased for business purposes, marketing materials, and internet and phone bills, inter alia.

82. Moreover, Color Street has structured its business operations and Agreement to benefit from the addition of more Stylists, while Stylists lose. Color Street benefits when tens of thousands are active on social media, but incurs no other expense unless the Stylist generates a sale. While Color Street benefits from an oversaturation of Stylists, the individual Stylists only have more competitors and a harder time setting themselves apart. And nowhere in the Agreement does Color Street promise to limit the number of Stylists retained in any way.

83. Given that Stylists must compete with Color Street and other Stylists for retail sales under such oppressive and onerous terms, it is no surprise that the overwhelming majority never receive commission or struggle to break even. But because Stylists receive commission from the retail sales made by any Stylists they recruit, Color Street's own income disclosures indicate that those who advance to higher levels through recruiting more Stylists on average earn more money. Thus, Stylists have a financial incentive to advertise the opportunity to work with Color Street under these unfair, unconscionable, and oppressive terms. Those new Stylists in turn will pay Color Street various fees discussed herein, buy merchandise from Color Street, promote Color Street on social media, be subject to the same restrictions on selling as those who recruited them, and like those before them, find profiting from selling to be futile and turn to recruiting.

---

[32] *Id.*
[33] *Id.*

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

### C. Color Street's Misclassification of Plaintiff and Stylists Was Willful.

84. Color Street's decision to misclassify the Stylists as independent contractors was willful and intentional.

85. ***First,*** Color Street has registered to do business in California, and thus, it is aware of California's labor and employment laws. It is a highly sophisticated, large company, whose legal team includes California lawyers, including those at the prestigious law firms that provide it representation in other matters. Both its management and its legal team would be exposed to news about changes in California law with respect to misclassification.

86. ***Second,*** as detailed above, Color Street's Agreement and Policies & Procedures, as well as other materials and communications to Stylists, set forth various rules and policies. Color Street knew and intended for Stylists to conform to these rules and policies and ensured adherence through its own platforms and other instrumentalities.

87. ***Third,*** Color Street knows and depends on the Stylists and even the highest levels of the company understand that the Stylists play an essential role in Color Street's growth and business model. The management team not only understands the essential role the Stylists play, but know they are classified as independent contractors, as evidenced by their decision to operate the company as an MLM. Thus, the decision was not a singular decision by a low-level employee, but a conscious and knowing choice endorsed by the highest levels of Color Street's management.

88. ***Fourth,*** Color Street further knows and understands as an MLM, few workers will make money under a commission structure, and repeatedly states in publicly accessible documents that its Stylists only get paid if they make a sale, no matter how many hours they worked promoting Color Street. Indeed, the commission structure represents a significant cost savings over the payment of hourly wages.

Color Street is aware that it is receiving inexpensive, commission-based work from its Stylists—it intentionally structured the program in that way.

89. ***Fifth,*** Color Street knew that its Stylists were not engaged in either type of work protected under the Direct Sales Exemption. It does not use terms like "buy-sell" or "deposit-commission" in its compensation documents or Agreement. It also knows that its Stylists engage primarily in social media marketing on its behalf, and are rarely, if ever, engaging in person sales or hosting parties in others' homes, particularly during and since the COVID pandemic. And it designs platforms, such as the Color Street Stylist App, Virtual Office, and Replicated Websites, to facilitate online sales and marketing.

90. ***Sixth,*** Color Street knew the Direct Sales Exemption was enacted years ago, and there was no guarantee that all MLMs could enjoy its protection. Rather, Color Street has been an MLM since 2017 and thus, should have or did know that the classification of MLM workers has for years been one of the most critical legal and policy issues for the industry.

91. For example, in 2018, the Oregon Supreme Court determined that an MLM had misclassified its sales personnel as independent contractors. *See ACN Opportunity, LLC v. Employment Department*, 362 Or. 824 (2018). The decision was based in part on the fact that the statute exempted sales "in the home," and the legislative history indicated that this exemption was narrowly tailored to apply to things like Tupperware parties. Notably, the concurrence made clear that the direct sales laws on the books reflect outdated direct selling practices and may not reach many modern MLMs. It is hard to imagine that Color Street would not have learned of a decision by a state supreme court, particularly given the decision's significance to its industry.

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

### D. Color Street's Misclassification of Stylists and Unfair Business Practices Harm the California Public.

92. Color Street's misclassification of its workers and unfair and unconscionable business model threatens the general public. Because Color Street has no incentive to stop these practices, a public injunction is necessary to stop these practices.

#### 1. Color Street Uses Widespread Advertising Practices Directed at the General Public to Recruit New Stylists.

93. Color Street has eschewed traditional recruiting practices in lieu of widespread advertising. Because of how Color Street recruits, nearly everyone in the state of California is likely to be targeted for recruiting and engagement in Color Street's unfair and unlawful business model.

94. Rather than market job opportunities to job seekers meeting certain criteria, Color Street uses its Stylists to promote the Stylist opportunities in the same way they advertise its products. Color Street has set up its compensation structure and business model to incentivize Stylists to turn to recruiting, and those Stylists in turn will promote the opportunity to their customers, as well as their family and friends. Thus, the public does not need to be affirmatively seeking out job opportunities; merely buying a routine consumer good or having a friend or family member working as a Stylist may subject them to recruiting messaging, and by extension, could lead them to accept the Agreement and become a Stylist.

95. Moreover, Color Street's reliance on its existing Stylist network to advertise the Independent Consulting opportunity is likely to cause the message to reach the general public at large, as its network is enormous. Color Street likely has over 130,000 Stylists nationwide.[34] While the MLM industry generally saw massive upticks in enrollment numbers during the COVID-19 pandemic, and numbers have

---

[34] *Color Street*, MARCH OF DIMES, https://www.marchofdimes.org/color-street (last accessed Mar. 5, 2025).

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

declined since then, there are likely thousands still in California, and numbers could surge under another pandemic or major economic downturn. Stylists need not respect geographic boundaries when advertising the Stylist opportunity, and thus, any member of the California public who either personally knows a Stylist or follows one on social media, regardless of where the Stylist lives, is likely to receive messages about the Stylist opportunity.

96. Because of the financial incentives those Stylists receive, members of the public may sometimes repeatedly and consistently receive advertising about the Stylist opportunity over weeks or months at a time, and perhaps from multiple Stylists. Indeed, each newly recruited Stylist presents the risk of an exponential increase of Stylists. Stylists can maintain their status and receive additional compensation based on the sales volume of the downline Stylists that they recruited. The more Stylists recruited into their downline, the more likely it is that they will be able to generate more income.

97. Because Stylists are incentivized to aggressively recruit new Stylists, and Color Street considers every customer to be a potential Stylist, California's residents are vulnerable to long-term consequences of Color Street's rampant misclassification. Notably, Color Street is not a selective employer; it requires little in the way of experience or other criteria. The overwhelming majority of adults in the state of California are likely qualified for the job, and millions of people in the state may seek out this opportunity. Indeed, it is estimated that one in every thirteen Americans will participate in an MLM at some point in their lifetimes.[35] This could translate into hundreds of thousands of Californians, if not millions of Californians, who are at risk of being recruited into an illegal and unfair working arrangement.

---

[35] Marguerite DeLiema, et al., *AARP Study of Multilevel Marketing: Profiling Participants and their Experiences in Direct Sales*, AARP FOUNDATION (2018), at 13, https://www.aarp.org/content/dam/aarp/aarp_foundation/2018/pdf/AARP%20Foundation%20MLM%20Research%20Study%20Report%2010.8.18.pdf.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

**2. Color Street's Unfair and Unlawful Conduct Harms California In Other Ways.**

98. Beyond recruitment, Color Street's misclassification of their Stylists harms Californians both economically and socially. When Stylists lose money and accumulate credit card debt, they and their families are harmed by the siphoning away of their uncompensated time and lost money on business expenses. This results in them and their families having fewer resources to invest in legitimate businesses and less time to spend working for real, guaranteed wages. And instead of the opportunity being a "side hustle" that allows them to pay off mortgages or student loan debt, cover costs of childcare, or otherwise advance financially, the loss of money from Independent Consulting could cause them more economic hardship.

99. This public harm intensifies during periods of crisis. It is well-documented that MLMs, like Color Street, profited from greater recruitment of participants during the COVID-19 pandemic.[36] Color Street expects the same profit from future crises, such as financial recessions, because it recruits new Stylists under the guise that they will be able to grow their own business with a sustainable income. Color Street siphons potential workers away from legitimate opportunities with the promises of building a personal business, when these individuals are under Color Street's control with none of the benefits of proper classification.

100. Color Street's practices also harm competitors, such as legitimate companies in the beauty and nail care space, who must and do pay wages and benefits at prevailing market rates to market and sell their products. By misclassifying its workers, and paying them only for certain sales, Color Street incurs lower expenses, giving them a competitive advantage over other market participants.

/ / /

---

[36] Abby Vesoulis & Eliana Dockterman, *Pandemic Schemes: How Multilevel Marketing Distributors Are Using the Internet—and the Coronavirus—to Grow Their Businesses*, TIME, Jul. 9, 2020, https://time.com/5864712/multilevel-marketing-schemes-coronavirus/.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

101. The California Legislature specifically considered harms like these in passing AB 5. The legislature recognized "harm to misclassified workers who lose significant workplace protections, the unfairness to employers who must compete with companies that misclassify, and the loss to the state of needed revenue from companies that use misclassification to avoid obligations such as payment of payroll taxes, payment of premiums for workers' compensation, Social Security, unemployment, and disability insurance" and that "the misclassification of workers as independent contractors has been a significant factor in the erosion of the middle class and the rise in income inequality." Color Street's continued misclassification of California workers will exacerbate all these harms to the California public.

102. Absent an injunction protecting the public from the negative impacts of Defendants' illegal activities, including by and through their officers and/or entities in their control, the California public remains at risk from Color Street's deceptive recruitment strategies and the economic and social harms created by their unlawful practices.

**E. <u>Plaintiff's Experiences as a Color Street Stylist</u>**

103. Plaintiff Kristy Fields worked for Color Street as a Stylist from February 2018 to present.

104. When she signed up, Color Street required Plaintiff to adhere to its many rules and policies, including those codified in the Agreement and Policies & Procedures. Plaintiff was not engaged in an independently established trade, occupation, or business as a sales professional and had limited sales experience. Color Street also required Plaintiff to purchase a Starter Kit to become a Stylist.

105. Around the time she signed up, Plaintiff filled out her profile on the Color Street Virtual Office. This included providing her social media information to Color Street, which they could access to monitor her compliance with the Agreement.

/ / /

/ / /

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

106. Color Street also provided Plaintiff with a personalized Color Street website URL for her Replicated Website and a "Stylist ID" number, and instructed her to provide these to prospective customers.

107. At no time was Plaintiff instructed to focus on in-person sales. As a general matter, Plaintiff understood from communications, directives, and practices of Color Street that sales efforts were to be predominately online.

108. In the course of her tenure as a Stylist on behalf of Color Street, Plaintiff predominately marketed Color Street products on various social media platforms, including Facebook and Instagram. To carry out this marketing work, Plaintiff performed the following tasks:

a) Purchased and tried out Color Street products and learned the product catalog;
b) Posted on Plaintiff's social media pages about Color Street products, including brainstorming content, drafting and editing the text, and taking photographs and video recordings for posts, as well as incorporating Color Street-approved messaging for many, if not all, of her posts;
c) Developed and followed up with Color Street sales leads;
d) Regularly monitored the Color Street Stylist app as well as Plaintiff's social media pages to engage further with customers, and replied to any direct messages from interested customers;
e) Hosted online private groups and events over Plaintiff's social media pages;
f) Evaluated customers' needs, lifestyle, and goals to put together customized Color Street product bundles for her customers;
g) Participated in efforts to recruit, onboard, train, and/or mentor new Stylists;
h) Attending meetings with upline and downline Stylists;

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

i) Tracked and reported her progress and sales using Color Street products; and

j) Attended several annual conferences hosted by Color Street, which included several full days of Color Street programming.

109. Plaintiff performed all these tasks regularly throughout her tenure, typically spending about ten to fifteen hours a week, often working for periods of more than two to three hours. At times during her peak involvement, Plaintiff worked over eight hours a day. Plaintiff performed Color Street-related activities throughout the day, nearly every day, often in short increments adding up to two to three hours a day.

110. Plaintiff rarely, if ever, sold to customers in-person, and her advertising and messaging was done online.

111. Plaintiff, like all Stylists, worked under Color Street's pervasive control and direction. Selling Color Street products—the main responsibility of Stylists—is work that is precisely in line with Color Street's usual course of business.

112. Plaintiff paid the following fees and out-of-pocket, work-related expenses throughout her tenure, for which she was not reimbursed by Color Street:

a) Purchased a Starter Kit;

b) The required monthly $9.95 fee each month since signing up;

c) Color Street-branded merchandise for social media activity and connection;

d) Non-Color Street-branded sales aids, promotional items, and sales technology;

e) Fees for conferences and events provided by Color Street and its affiliates;

f) Travel and lodging to Color Street conferences and events; and

g) Monthly bills for her cell phone and internet access.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

113. During Plaintiff's tenure, Color Street determined the prices at which all products could be sold. She did not have the authority nor ability to sell or advertise prices for Color Street products at a different price. All sales by any customer that Plaintiff referred to Color Street were made through Color Street-controlled platforms.

114. During Plaintiff's tenure, including during the last four years, Plaintiff was not compensated for her time doing any of the forementioned activities, nor paid any overtime.

115. During Plaintiff's tenure, Plaintiff regularly paid out of pocket for expenses related to her work for Color Street. Plaintiff was not compensated for out-of-pocket expenses.

116. The commissions were paid via direct deposit. No paystub was provided that identified hours worked, nor were any employment taxes withheld at any time. For some of Plaintiff's sales, Color Street did not pay commission because the customer returned the products.

## V. <u>CLASS ALLEGATIONS</u>

117. Plaintiff incorporates and realleges the above paragraphs.

118. Plaintiff brings this action on her own behalf, as well as on behalf of each and all other persons similarly situated, and thus seeks class certification under California Code of Civil Procedure section 382.

119. All claims alleged herein arise under California law for which Plaintiff seeks relief authorized by California law.

120. Plaintiff's proposed class consists of and is defined as follows:

> All current and former Stylists who resided in the State of California or who performed marketing or sales activities in California during the applicable statutes of limitations through the date a class is certified.

121. Plaintiff also alleges the following subclass:

The Above-Standard Minimum Wage Subclass

All current and former Color Street Stylists classified as independent contractors who resided in California cities or counties with a minimum wage rate greater than the California minimum wage during the applicable statutes of limitations through the date a class is certified. This subclass includes, but is not limited to, residents of Los Angeles (City and County), San Francisco, San Diego, Oakland, and San Jose.

122. Members of the Class will hereinafter be referred to as "Class Members." Plaintiff reserves the right to redefine the Class and to add subclasses as appropriate based on further investigation, discovery, and specific theories of liability.

123. ***Ascertainable and numerous.*** The Class is ascertainable and numerous such that joinder is impractical. The membership of the entire class is unknown to Plaintiff at this time. However, the class will likely consist of thousands of members, the precise number which is within the knowledge of and can be readily ascertained through Color Street's records.

124. ***Community of Interest.*** There is a well-defined community of interest amongst Class Members. A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because the Class is both numerous and its membership is geographically widespread across California. A class action will achieve economies of time, effort and expense as compared with separate lawsuits, and will avoid inconsistent outcomes because the same issues can be adjudicated in the same manner and at the same time for the entire class. In addition:

125. ***Predominating Common Questions.*** There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the Class are:

a) Whether Color Street misclassified its Stylists as independent contractors when in fact they were Color Street employees;



Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

b) Whether Color Street failed to pay Plaintiff and Class Members the legally mandated minimum wage for all hours worked;

c) Whether Color Street failed to pay Plaintiff and Class Members overtime wages;

d) Whether Color Street failed to timely pay wages due to Plaintiff and Class Members during their employment;

e) Whether any misclassification by Color Street was voluntary and knowing;

f) Whether Stylists' duties fall within the Direct Sales Exemption to AB5;

g) Whether Color Street controlled the manner and means of the Stylists' work;

h) Whether Color Street failed to reimburse Stylists' business expenses;

i) Whether Color Street failed to maintain accurate time records for its Stylists;

j) Whether Color Street failed to provide complete and accurate wage statements to its Stylists;

k) Whether Color Street failed to pay Stylists their wages due at termination; and

l) Whether Color Street should be enjoined from continuing the practices described herein.

126. ***Typicality.*** Plaintiff's claims are typical of the claims of Class Members because Plaintiff, like all members of the Class, worked as a Stylist for Color Street in California, was required to adhere to Color Street's policies, and was paid on a commission basis. Furthermore, like all members of the Class, Plaintiff sustained damages from Color Street's wrongful conduct. Accordingly, Plaintiff has no interests antagonistic to the interests of any other member of the Class.

/ / /

127. ***Adequacy.*** Plaintiff will fully and adequately assert and protect the interests of the Class and has retained counsel who are experienced in prosecuting class actions. Plaintiff acknowledges that she has an obligation to make known to the Court any relationship, conflicts or differences with any Class Member. Plaintiff's attorneys, the proposed class counsel, are versed in the rules governing class action discovery, certification, and settlement. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

## VI. FACTS RELATING TO PLAINTIFF AS A PRIVATE ATTORNEY GENERAL

128. At all times set forth herein, PAGA was applicable to Plaintiff's employment by Defendants.

129. At all times set forth herein, PAGA provides that, notwithstanding any other provision of law, any provision of law under the California Labor Code that provides for a civil penalty, including unpaid wages and premium wages, to be assessed and collected by the California Labor & Workforce Development Agency ("LWDA") for violations of the California Labor Code may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of the aggrieved employee and other current or former employees pursuant to procedures set forth in California Labor Code § 2699.3.

130. Pursuant to PAGA, a civil action may be brought by an "aggrieved employee," who is any person that was employed by the alleged violator and against whom one or more of the alleged violations was committed.

131. Plaintiff was employed by Defendants and the alleged violations were committed against her and she is, therefore, an aggrieved employee. Likewise, the other Stylists who worked within the relevant time are "aggrieved employees" as defined by California Labor Code § 2699(c) in that they are current or former employees of Defendants and one of more of the alleged violations were committed against them.

132. Pursuant to California Labor Code §§ 2699.3 and 2699.5, an aggrieved employee, including Plaintiff, may pursue a civil action arising under PAGA after the following requirements have been met:

a) The aggrieved employee shall give written notice (hereinafter "Employee's Notice") to the LWDA and the employer of the specific provisions of the Labor Code alleged to have been violated, including the facts and theories to support the alleged violations.

b) The LWDA shall provide notice (hereinafter "LWDA Notice") to the employer and the aggrieved employee that it does not intend to investigate the alleged violation within sixty (60) calendar days of the postmark date of the Employee's Notice. Upon receipt of the LWDA Notice, or if the LWDA Notice is not provided within sixty-five (65) calendar days of the Employee's Notice, the aggrieved employee may commence a civil action pursuant to California Labor Code section 2699 to recover civil penalties in addition to any other penalties to which the employee may be entitled.

133. Plaintiff has satisfied these statutory requirements. On February 24, 2025, Plaintiff provided notice by electronic submission to the LWDA and by certified mail to Color Street LLC, Fa Park, Brian J. Lee, and Brick Bergeson regarding the specific provisions of the California Labor Code alleged to have been violated, including the facts and theories to support the alleged violations, pursuant to § 2699.3. A true and correct copy of that notice letter is attached as **Exhibit B**. An additional notice was sent on March 11, 2025, regarding the remaining Defendants, a true and correct copy of which is attached as **Exhibit C**. The LWDA has not expressly stated that it will intervene or investigate, or otherwise responded regarding Plaintiff's asserted PAGA claims against Defendants herein.

/ / /

/ / /

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Failure to Pay Minimum Wages and Liquidated Damages)**
**Cal. Lab. Code §§ 1182.12, 1194, 1197, 1197.1, 1198, 558.1, 1194.2, 558(a); IWC Wage Order 4-2001**

***Against COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive***

134. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

135. At all relevant times, California Labor Code §§ 1182.12, 1194, 1197, 1197.1, and 1198 have provided that the minimum wage for employees fixed by the Industrial Welfare Commission is the minimum wage to be paid to employees, and the payment of a wage less than the minimum so fixed is unlawful. California law provides employees in California must be paid for all hours worked, up to 40 per week or eight (8) per day, at a regular time rate no less than the mandated minimum wage. Compensable work time is defined by the applicable wage order as "the time during which an employee is subject to the control of an employer and includes all the time the employee is suffered or permitted to work, whether or not required to do so." Cal. Code Regs. Tit. 8, § 11070(2)(G) (defining "Hours Worked").

136. As alleged herein, during the relevant time period, Color Street maintained and still maintains a policy of requiring employees to work off-the-clock, without compensation. Color Street only compensates Stylists, including Plaintiff, based on specific sales placed through the Color Street website, and does not pay wages for other hours worked. These hours include time spent doing the following, inter alia:

a) in training;
b) making and responding to social media posts;
c) purchasing inventory from Color Street;

d) communicating with other Stylists about policies, practices, and sales instructions and guidance;

e) communicating with customers after their purchases were made to handle routine customer service; and

f) handling other responsibilities as needed.

Plaintiff and Class Members performed these activities throughout the day, nearly every day, often in short increments adding up to two to three hours a day, or more.

137. Color Street provided no way for Plaintiff and Class Members to log time spent and submit to Color Street.

138. Color Street's failure to pay Plaintiff and Class Members for work, and failure to pay overtime wages owed, also resulted in failures to pay Plaintiff and Class Members the minimum wage required, in violation of California Labor Code §§ 1182.12, 1194, 1197, 1197.1, 1198. In addition, Color Street's failure to pay for hours worked is a violation of various municipal and county codes across the state, including, but not limited to City of Los Angeles Municipal Code Art. 7; County of Los Angeles Code § 8.100.040, *et seq*., San Francisco Cal. Code 12R.

139. California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for minimum wage violations. *See* Cal. Lab. Code § 558.1. Defendants COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive, failed to pay Plaintiff and other aggrieved employees the minimum wage and all Defendants are liable for causing this violation under § 558.1.

140. As such, pursuant to California Labor Code § 1194.2, Plaintiff and Class Members are entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon. Pursuant to § 558(a), Plaintiff and Class Members are also entitled to recover unpaid wages and statutory damages in the amount of $50 for any initial violation per employee for each pay period and $100 for

each subsequent violation per employee for each pay period and interest pursuant to § 218.6.

**SECOND CAUSE OF ACTION**

**(Failure to Pay Overtime Wages and Liquidated Damages)**
**Cal. Lab. Code §§ 510, 558.1, 1194.2, 558(a); IWC Wage Order 4-2001**
***Against COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive***

141. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

142. California Labor Code § 510 and Wage Order No. 4-2001 require employers to pay no less than one and one-half times the regular rate of pay of the employee for hours worked in excess of eight (8) hours in one workday, for hours worked in excess of forty (40) hours in one workweek, and for the first eight (8) hours worked on the seventh day of work in any one workweek, and to pay no less than twice the regular rate of pay of the employee for hours worked in excess of twelve (12) hours in one workday and for any work in excess of eight (8) hours on any seventh day of a workweek. During the relevant time period, Plaintiff and other aggrieved employees worked over 8 hours in a day and/or 40 hours in a week without overtime compensation because Color Street failed to pay them for their work duties, as described above. This was, in turn, due to Color Street's unlawful misclassification of Stylists as independent contractors rather than as employees. On occasions when Plaintiff and other aggrieved employees had already worked eight hours in one day (performing all their work off-the-clock), Color Street failed to pay them any overtime compensation due. Therefore, Plaintiff and the other aggrieved employees were entitled to receive overtime compensation from Color Street that Color Street failed to pay, violating California Labor Code § 510 and Wage Order No. 4-2001. In addition, Color Street's failure to pay overtime is a violation of various municipal and county codes across the state, including, but not limited to City of Los Angeles

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Municipal Code Art. 7; County of Los Angeles Code § 8.100.040, *et seq*., San Francisco Cal. Code 12R.

143. California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for overtime wage violations. *See* Cal. Lab. Code § 558.1. Defendants COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive, failed to pay Plaintiff and other aggrieved employees overtime wages and all Defendants are liable for causing this violation under § 558.1.

144. As such, pursuant to California Labor Code § 1194.2, Plaintiff and Class Members are entitled to recover liquidated damages in an amount equal to the wages unlawfully unpaid and interest thereon. Pursuant to § 558(a), Plaintiff and Class Members are also entitled to recover unpaid wages and statutory damages in the amount of $50 for any initial violation per employee for each pay period and $100 for each subsequent violation per employee for each pay period and interest pursuant to § 218.6.

## <u>THIRD CAUSE OF ACTION</u>

**(Failure to Provide Rest Periods or Rest Break Premium Wages)**
**Cal. Lab. Code §§ 226.7, 558.1; IWC Wage Order 4-2001**

***Against COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive***

145. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

146. California Labor Code § 226.7 and IWC Wage Order 4-2001 require an employer to authorize or permit an employee to take a rest period of ten net minutes for every four hours worked, or major fraction thereof, and such rest periods must be in the middle of the four-hour period insofar as practicable. If the employer fails to provide any required rest periods or fails to provide a fully compliant rest break for a net ten minutes wherein the employee is fully relieved of all duties and all employer



Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

control, the employer must pay the employee one hour of pay at the employee's regular rate of compensation for each workday the employer did not provide a legally required and/or fully compliant rest period.

147. Color Street failed to provide Plaintiff and the Class all required and/or fully compliant rest periods, or compensation in lieu thereof. Color Street employed policies and procedures that ensured Plaintiff and the Class would not receive all legally required rest periods as Color Street improperly classified Plaintiff and the Class as independent contractors rather than as employees and did not authorize nor permit all required rest periods in strict accordance with the timing requirements of all applicable Wage Orders. Color Street similarly employed policies and procedures that rendered rest periods non-compliant with the requirements of California law by, inter alia, failing to relieve Plaintiff and the Class of all duties and all employer control. Color Street further employed policies and procedures ensuring Plaintiff and the Class never received a rest period premium during employment.

148. California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for rest period violations. *See* Cal. Lab. Code § 558.1. Defendants COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive, failed to provide Plaintiff and the Class all rest periods or compensation in lieu thereof and all Defendants are liable for causing this violation under § 558.1.

149. As a result, under California Labor Code § 226.7, Plaintiff and the Class are entitled to one additional hour's pay for each day a rest break was missed, late or interrupted, all in an amount according to proof.

/ / /

/ / /

/ / /

/ / /

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

## FOURTH CAUSE OF ACTION

**(Failure to Provide Meal Periods or Meal Premium Wages)**
**Cal. Lab. Code §§ 226.7, 512(a), 1198, 558.1; IWC Wage Order 4-2001**
***Against COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive***

150. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

151. Under California Labor Code §§ 226.7, 512(a), 1198, and IWC Wage Order 4-2001, Color Street was required to provide Plaintiff and Class Members with one thirty-minute meal break free from all duties for all shifts longer than five (5) hours, and a second thirty-minute meal break free from all duties for all shifts longer than 10 hours and a third thirty-minute meal break free from all duties for all shifts longer than 15 hours. Employers covered by the Wage Orders have an obligation to both (1) relieve their employees for at least one meal period for shifts over five hours, and (2) to record having done so. If the employer fails to properly record a valid meal period, it is presumed no meal period was provided. Section 226.7 also requires an employer to pay mandated premiums of an extra hour of wages to any employees who have not been provided with a timely meal or rest break.

152. As alleged herein, Plaintiff and the Class regularly worked periods of more than five (5), ten and fifteen hours in a workday without being provided requisite mandatory timely, thirty-minute, duty-free meal periods. Color Street also failed to pay Plaintiff and the Class an additional hour of wages at her regular rate for each workday a meal period and/or a legally compliant meal period was not provided.

153. Color Street failed to provide Plaintiff or the other aggrieved employees with an opportunity to take timely, uninterrupted meal periods of the requisite length, free from employer control. Color Street also failed to compensate Plaintiff and the other aggrieved employees properly for the non-compliant meal periods including, inter alia, missed, short, late, and/or interrupted meal periods. Color Street also failed to pay premium wages for the many meals that Plaintiff and the aggrieved employees

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

were deprived of. Indeed, Color Street did not provide any meal breaks or premium compensation for missed breaks to Plaintiff or other aggrieved employees, since Color Street improperly classified its Stylists as independent contractors who were not entitled to meal breaks.

154. California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for meal period violations. *See* Cal. Lab. Code § 558.1. Defendants COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive, failed to provide Plaintiff and other aggrieved employees all meal periods or compensation in lieu thereof and all Defendants are liable for causing this violation under § 558.1.

155. As a result, under California Labor Code § 226.7, Plaintiff and the Class are entitled to one additional hour's pay for each day a meal period was missed, late or interrupted, all in an amount according to proof.

**FIFTH CAUSE OF ACTION**

**(Failure to Timely Pay Wages During Employment)**
**Cal. Lab. Code §§ 204, 210(a), 218.6**

***Against COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; and DOES 1–50, inclusive***

156. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

157. At all relevant times herein set forth, California Labor Code § 204 requires that all wages earned by any person in any employment between the 1st and the 15th days, inclusive, of any calendar month, other than those wages due upon termination of an employee, are due and payable between the 16th and the 26th day of the month during which the labor was performed, and that all wages earned by any person in any employment between the 16th and the last day, inclusive, of any calendar month, other than those wages due upon termination of an employee, are due and payable between the 1st and the 10th day of the following month.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

158. California Labor Code § 204 also requires that all wages earned for labor more than the normal work period shall be paid no later than the payday for the next regular payroll period.

159. During the relevant period, Color Street failed to pay Plaintiff and the Class, as well as all other aggrieved employees, all wages due to them, including minimum wages, overtime wages, and meal and rest period premium wages, within any time period specified by § 204. Moreover, Color Street failed to pay Plaintiff or other aggrieved employees earned commissions in a timely and complete fashion.

160. As such, pursuant to California Labor Code § 210(a), Plaintiff and Class Members are entitled to recover stator damages in the amount of $100 for any initial violation per failure to pay each employee and $200 for each subsequent, or willful or intentional violation for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld, and interest pursuant to § 218.6.

## SIXTH CAUSE OF ACTION

**(Failure to Keep Requisite Payroll Records)**
**Cal. Lab. Code § 1174(d), 1174.5**

***Against COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; and DOES 1–50, inclusive***

161. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

162. California Labor Code § 1174(d) requires an employer to keep, at a central location in the state or at the plants or establishments at which employees are employed, payroll records showing the hours worked daily by and the wages paid to, and the number of piece-rate units earned by and any applicable piece rate paid to, employees employed at the respective plants or establishments. These records shall be kept in accordance with rules established for this purpose by the commission, but in any case, shall be kept on file for not less than two years.

/ / /

/ / /

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

163. At all times herein set forth, California Labor Code § 1174.5 has imposed a civil penalty of $500 per aggrieved employee for each willful failure "to maintain . . . accurate and complete records required by subdivision (d) of Section 1174[.]"

164. Color Street has intentionally and willfully failed to keep accurate and complete payroll records showing the hours worked daily and the wages paid to Plaintiff. For example, any records kept by Color Street did not include the hours worked off-the-clock, the premium wages owed, and for missed and non-compliant meal and rest breaks.

165. Plaintiff has been injured by Color Street's intentional and willful violation of California Labor Code § 1174(d) because they were denied both their legal right and protected interest, in having available, accurate and complete payroll records pursuant to § 1174(d).

## SEVENTH CAUSE OF ACTION

**(Failure to Provide Timely and Accurate Wage Statements)**
**Cal. Lab. Code §§ 226(a), 1198, 226.3, 558.1, 226(e)**

***Against COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive***

166. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

167. At all relevant times herein set forth, California Labor Code § 226(a) provides that, at the time of each payment of wages, the employer must provide each employee with an itemized statement showing gross wages earned, total hours worked, all deductions taken, net wages earned, the inclusive dates for which the employee is being paid, the employee's name and last four digits of their social security number, the name and address of the legal entity that is the employer, and all applicable hourly rates in effect during the pay period and all hours worked at each rate.

168. California Labor Code § 1198 provides that the maximum hours of work and the standard conditions of labor shall be those fixed by the Labor Commissioner

and as set forth in the applicable IWC Wage Orders. Section 1198 further provides that "[t]he employment of any employees for longer hours than those fixed by the order or under conditions of labor prohibited by the order is unlawful." Pursuant to the applicable IWC Wage Order, employers are required to keep accurate time records showing when the employee begins and ends each work period and meal period.

169. At all times herein set forth, California Labor Code § 226.3 has imposed a civil penalty in addition to any other penalty provided by law of two hundred fifty dollars ($250) per aggrieved employee for the first violation of § 226(a), and one thousand dollars ($1,000) per aggrieved employee for each subsequent violation.

170. As alleged herein, Color Street knowingly and willfully failed to provide Plaintiff and the Class with proper, itemized wage statements. Wage statements provided to Plaintiff and the Class did not show total/actual hours worked and all applicable hourly rates in effect during the pay period and all hours worked at each rate. The wage statements provided to Plaintiff and the Class failed to reflect all time spent in training, making and responding to social media posts, making business expenditures by stocking their own Color Street inventory, and communicating with other Stylists about policies, practices, and sales instructions and guidance. Color Street's refusal to properly record this time, and to include it in its itemized wage statements, or to properly pay its employees for this time was willful and intentional. As a result of these violations, Plaintiff and the Class suffered injury because they were not paid for all hours worked.

171. California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for wage statement violations. *See* Cal. Lab. Code § 558.1. Defendants COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive, failed to provide Plaintiff and the Class accurate wage statements and all Defendants are liable for causing this violation under § 558.1.

172. Pursuant to California Labor Code § 226(e), Plaintiff and the Class are entitled to a penalty in the amount of fifty dollars ($50) for the initial pay period in which a violation occurred, and a penalty of one-hundred dollars ($100) for each violation in a subsequent pay period, up to an aggregate penalty of four-thousand dollars ($4,000), as well as costs of suit and attorneys' fees, all in an amount according to proof.

## EIGHTH CAUSE OF ACTION

**(Failure to Reimburse Business Expenses)**
**Cal. Lab. Code §§ 450, 2802, 558.1; IWC Wage Order 4-2001**
***Against COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive***

173. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

174. At all times herein set forth, California Labor Code § 2802 has provided and provides that an employer must reimburse employees for all necessary expenditures and losses incurred by the employee in the performance of their job. The purpose of § 2802 is to prevent employers from passing off their cost of doing business and operating expenses on to their employees. *Cochran v. Schwan's Home Service, Inc.*, 228 Cal. App. 4th 1137, 1144 (2014). The applicable wage order, IWC Wage Order 4-2001, paragraph 9(B) provides that: "When tools or equipment are required by the employer or are necessary to the performance of a job, such tools and equipment shall be provided and maintained by the employer, except that an employee whose wages are at least two (2) times the minimum wage provided herein may be required to provide and maintain hand tools and equipment customarily required by the trade or craft." Color Street's conduct, in misclassifying their Stylists as independent contractors and failing to reimburse them for expenses Stylists paid that should have been borne by their employer, constitutes a violation of California Labor Code §§ 450 and 2802.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

175. Color Street violates California Labor Code § 2802 by having failed, and failing, to reimburse Plaintiff and the Class for their business-related expenses. These expenses include the Starter Kit, mandatory $9.95/month fee that Color Street charged Plaintiff and the Class, as well as other business expenses, as set forth *supra* § IV.E, which Color Street did not reimburse. And during the relevant period, Color Street required that Plaintiff and the Class use their own personal cellular phones and/or cellular phone data to carry out Color Street's business operations, but failed to reimburse them for the full costs of their work-related cellular phone expenses. For example, Plaintiff and the Class were required to use a personal cellular phone to make social media posts and communicate with customers and their upline. Plaintiff and the Class also incurred expenses associated with maintaining a home internet connection. Color Street did not reimburse Stylists for these expenses.

176. Color Street's company-wide policy and/or practice of passing on their operating costs to Plaintiff and the Class violates California Labor Code § 2802. At all times described herein, Color Street has acted willfully, and deliberately with oppression, fraud and malice to unlawfully deprive their employees of the employees' own personal resources in furtherance of Color Street's profits.

177. California Labor Code § 558.1 states that any employer or person acting on behalf of an employer who causes a violation is liable, among other things, for failure to reimburse business expenses. *See* Cal. Lab. Code § 558.1. Defendants COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive, failed to reimburse business expenses to Plaintiff and the Class and all Defendants are liable for causing this violation under § 558.1.

178. As a result of Color Street's failure to reimburse Plaintiff and the Class for all business-related expenses, pursuant to California Labor Code § 2802, Plaintiff and the Class are entitled to recover unreimbursed business expenses, plus attorneys' fees and costs, in an amount according to proof.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

## NINTH CAUSE OF ACTION

**(Unfair Competition)**
**Bus. & Prof. Code § 17200 *et seq.***
***Against COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; and DOES 1–50, inclusive***

179. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

180. From a date unknown to Plaintiff and continuing to the present, Color Street has and continues to engage in business acts or practices that constitute unfair competition as defined in the Unfair Competition Law, Business and Professions Code § 17200 *et seq.*, in that such business acts and practices are unlawful and unfair within the meaning of that statute.

***"Unlawful" Prong***

181. Color Street has violated section 17200's prohibition on unlawful conduct through the following violations:

a) Failing to pay minimum wages, as set forth in the First Cause of Action;

b) Failing to pay overtime wages, as set forth in the Second Cause of Action;

c) Denying rest periods and/or failing to pay rest break premium wages, as set forth in the Third Cause of Action;

d) Failing to provide meal periods and/or pay associated premium wages, as set forth in the Fourth Cause of Action;

e) Failing to timely pay wages during employment, as set forth in the Fifth Cause of Action;

f) Failing to keep requisite payroll records, as set forth in the Sixth Cause of Action;

g) Failing to provide timely and accurate wage statements, as set forth in the Seventh Cause of Action; and

h) Failing to reimburse business expenses, as set forth in the Eighth Cause of Action.

182. The forgoing unlawful conduct of Color Street alleged herein constitutes unfair competition within the meaning of California Business and Professions Code § 17200 *et seq*.

***<u>"Unfair" Prong</u>***

183. Color Street has violated California Business and Professions Code § 17200's prohibition on unfair conduct by engaging in each of the forgoing unlawful acts.

184. Furthermore, as set forth *supra* Section IV.B.6, Color Street has violated § 17200's prohibition on unfair conduct by unfairly and unconscionably structuring its Agreement and business activities in a way that does not create meaningful opportunities for Stylists earn a fair wage and/or commission for their work. Color Street used its superior bargaining power, superior market power, and take-it-or-leave-it Agreement to prevent Stylists from exercising discretion and accessing tools and resources needed to market the products effectively and competitively to generate profits. And Color Street further undermined Stylists' ability to earn compensation by engaging in activities in competition with the Stylists, by for example, maintaining the exclusive right to disseminate online advertising to any customer sales leads generated by the Stylists and selling products via Amazon.com. By denying Stylists meaningful opportunities to earn fair commission, Color Street also unfairly incentivized Stylists to divert time and attention away from marketing the sale of products to retail customers to marketing the opportunity to become a Stylist to unsuspecting members of the California public. So long as Defendants continue these unfair practices, the California public remains at risk for being recruited into Color Street and similarly harmed.

185. Color Street's unfair acts were in contravention of public policy. California public policy encourages the proper classification of workers to ensure that

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

workers are fairly compensated and provided the full benefits and protections of employment, competitors are operating in a fair and honest marketplace, and the state is not deprived of tax revenue.

186. Color Street's unfair acts were immoral, unethical, oppressive, unscrupulous, and substantially injurious to the Class and general public. Color Street knowingly and willfully classified the Stylists as independent contractors. And it knowingly and willfully structured an unfair and unconscionable Agreement that did not provide for meaningful opportunities to earn compensation, while engaging in business activities that would further frustrate Stylists' efforts to earn compensation.

187. The impact on the Class and general public is not outweighed by any countervailing benefits. To the extent any benefits inured to Plaintiff, the Class, and the general public, those benefits are outweighed by the impact of Defendants' unfair acts. Stylists, including Plaintiff, incurred substantial costs in working as Stylists, and were not paid appropriately and fairly for their time and efforts. They could have chosen other opportunities or invested that time and money into other legitimate and fairly paying endeavors.

188. As a result of Color Street's unfair competition as alleged herein, Plaintiff and the Class have suffered injury in fact and lost money or property, as described in more detail above. Pursuant to California Business and Professions Code § 17200, *et seq.*, Plaintiff and the Class are entitled to restitution of all wages and other monies rightfully belonging to them that Color Street failed to pay and wrongfully retained by means of its unlawful and unfair business practices, and and/or all other equitable remedies that may be available.

189. To prevent Color Street from continuing to prey on the California public through their misclassification of their Stylists, and recruitment of new Stylists under these false pretenses, Plaintiff and the Class also seek a public injunction against Defendants enjoining Color Street, and any and all persons acting in concert with them, from engaging in each of the California Labor Code violations set forth herein

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

and from recruiting new Stylists or authorizing others to recruit new Stylists, under a misclassified status, including making representations about that status and the commission-based compensation structure.

**TENTH CAUSE OF ACTION**

**(Violation of Cal. Lab. Code §§ 2698-2699.8)**

***Against COLOR STREET LLC; INCOCO PRODUCTS LLC; INCOCO CAPITAL LLC; FA PARK; BRIAN J. LEE; BRICK BERGESON; MATT WARNER; and DOES 1–50, inclusive***

190. Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

191. PAGA establishes that, notwithstanding any other provision of law, any provision of the California Labor Code which provides for a civil penalty to be assessed and collected by the LWDA, or any of its departments, divisions, commissions, boards, agencies or employees for a violation of the California Labor Code, may be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself, and other current or former employees.

192. Whenever the LWDA, or any of its departments, divisions, commissions, boards, agencies, or employees has discretion to assess a civil penalty, a court in a civil action is authorized to exercise the same discretion, subject to the same limitations and conditions, to assess a civil penalty.

193. Plaintiff and the other Stylist employees are "aggrieved employees" as defined by California Labor Code § 2699(c) in that they are all current or former employees of Defendants, and one or more of the alleged violations were committed against them.

194. Defendants' conduct, as alleged herein, violates numerous sections of the California Labor Code, including, but not limited to, the following:

a) Failing to pay minimum wages, as set forth in the First Cause of Action;
b) Failing to pay overtime wages, as set forth in the Second Cause of Action;

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

c) Denying rest periods and/or failing to pay rest break premium wages, as set forth in the Third Cause of Action;

d) Failing to provide meal periods and/or pay associated premium wages, as set forth in the Fourth Cause of Action;

e) Failing to timely pay wages during employment, as set forth in the Fifth Cause of Action;

f) Failing to keep requisite payroll records, as set forth in the Sixth Cause of Action;

g) Failing to provide timely and accurate wage statements, as set forth in the Seventh Cause of Action; and

h) Failing to reimburse business expenses, as set forth in the Eighth Cause of Action; and

i) Willfully misclassifying Promoters as independent contractors, in violation of California Labor Code §§ 226.8 and 2775.

195. Pursuant to PAGA, and in particular California Labor Code §§ 2699(a), 2699.3, and 2699.5, Plaintiff, acting in the public interest as a private attorney general, seeks assessment and collection of civil penalties for Plaintiff, all other aggrieved employees, and the State of California against Defendants, in fixed amounts for each aggrieved employee for every pay period in which there was a violation, per § 2699(f), in addition to other remedies, for violations of Labor Code sections set forth herein.

196. Pursuant to California Labor Code § 2699(i), civil penalties recovered by aggrieved employees shall be distributed as follows: sixty-five percent (65%) to the LWDA for the enforcement of labor laws and education of employers and employees about their rights and responsibilities and thirty-five (35%) to the aggrieved employees.

197. Further, and as authorized by the California Labor Code § 2699(g), Plaintiff seeks recovery of her attorneys' fees and costs.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

## VIII. PRAYER FOR RELIEF

WHEREFORE Plaintiff and the Class pray for judgment and relief as follows:

(1) An order certifying that this action may be maintained as a class action, that Plaintiff be appointed Class Representative, and that Plaintiff's counsel be appointed Class Counsel;

(2) Statutory penalties and compensatory damages as authorized under the California Labor Code;

(3) Civil penalties pursuant to California's Private Attorneys General Act;

(4) Restitution and all other equitable remedies pursuant to California's Unfair Competition Law;

(5) Public Injunctive relief, pursuant to California's Unfair Competition Law, prohibiting Color Street, its officers, agents, employees, and attorneys, and all other persons in active concert or participation with any of them, whether acting directly or indirectly, in connection with the management, hiring, or coordination of Stylists, or the advertising, promotion, or recruitment of new Stylists, from:

a. Engaging in the California Labor Code violations as alleged herein, including classifying Stylists as non-employees or independent contractors;

b. Recruiting new Stylists or authorizing others to recruit new Stylists, under a misclassified status, including making representations about that status and the commission-based compensation structure.

(6) Punitive damages against the individual officer, director or managing agent Defendants pursuant to Cal. Civil Code § 3294;

(7) Reasonable attorneys' fees pursuant to the California Labor Code, including §§ 226(e), 2699(g), and Code of Civil Procedure § 1021.5;

(8) Costs of this suit per California Labor Code § 2699(g);

(9) Pre- and post-judgment interest pursuant to Labor Code § 218.6; and

(10) Such other and further relief as the Court may deem just and proper.

## IX. DEMAND FOR TRIAL BY JURY

Plaintiff and the Class hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

DATED: June 23, 2025

**CLARKSON LAW FIRM, P.C.**

By: */s/ Kristen G. Simplicio*
Kristen G. Simplicio
Glenn A. Danas
Laura E. Older
Cody Laux

*Attorneys for Plaintiff and Putative Class*